11-5227-cv(L)
United States Securities and Exchange Commission v. Citigroup Global Markets, Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: February 8, 2013          Decided: June 4, 2014)

Docket Nos.  11-5227-cv (L); 11-5375-cv(con), 11-5242-cv(xap)


_____


UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
*Plaintiff-Appellant-Cross-Appellee,*

v.

CITIGROUP GLOBAL MARKETS, INC.,

*Defendant-Appellee-Cross-Appellant*.


_____


Before: POOLER, LOHIER, and CARNEY, *Circuit Judges*.

The United States Securities and Exchange Commission ("S.E.C.") appeals

from the November 28, 2011 order of the United States District Court for the

Southern District of New York (Jed S. Rakoff, *J.*) refusing to approve a settlement

between the S.E.C. and Citigroup Global Markets Inc. and setting a trial date.

Our Court stayed the order on March 15, 2012.  *S.E.C. v. Citigroup Global Mkts.*,

*Inc.*, 673 F.3d 158 (2d Cir. 2012).  We find the district court abused its discretion by applying an incorrect legal standard in its review, and vacate and remand for further proceedings consistent with this opinion.

Vacated and remanded.

_____

MICHAEL A. CONLEY, Deputy General Counsel, Securities and Exchange Commission (Jacob H. Stillman, Solicitor, Mark Pennington, Assistant General Counsel, Jeffrey A. Berger, Senior Counsel, *on the brief*), Washington, D.C., *for Plaintiff-Appellant-Cross-Appellee United States Securities and Exchange Commission.*

BRAD S. KARP, Paul, Weiss, Rifkind, Wharton & Garrison, LLP (Theodore V. Wells, Jr., Mark F. Pomerantz, Walter Rieman, Susanna M. Buergel, *on the brief*), New York, N.Y., *for Defendant-Appellee-Cross-Appellant Citigroup Global Markets, Inc.*

JOHN R. WING, Lankler Siffert & Wohl LLP (Patrick P. Garlinger, *on the brief*), New York, N.Y., *Appointed Pro Bono Counsel for the United States District Court for the Southern District of New York (Jed S. Rakoff, J.).*

MARK A. PERRY, Gibson, Dunn & Crutcher, LLP, Washington, D.C., *for Amicus Curiae Business Roundtable, in support of reversal.*

WILLIAM MICHAEL CUNNINGHAM, Temple Hills, MD, *Amicus Curiae pro se, in support of affirmance.*

DENNIS M. KELLEHER (Stephen W. Hall, Katelynn O. Bradley, *on the brief*) Washington, D.C., *for Amicus Curiae Better Markets, Inc., in support of the affirmance.*

MATTHEW G. YEAGER, PH.D., Department of Sociology, King's University College, London, Ontario (William Calathes, Department of Criminal Justice, New Jersey City University, Jersey City, N.J., *on the brief*), *Amici Curiae pro se, in support of affirmance.*

BARBARA J. BLACK, Charles Hartsock Professor of Law & Director, Corporate Law Center, University of Cincinnati College of Law, Cincinnati, Ohio, *for Amici Curiae Securities Law Scholars Jayne W. Barnard, Douglas M. Branson, Chris J. Brummer, Samuel W. Buell, John C. Coffee, Jr., James D. Cox, James Fanto, Jill E. Fisch, Tamar Frankel, Theresa Gabaldon, Joan MacLeod Heminway, Thomas W. Joo, Lawrence E. Mitchell, Jennifer O'Hare, Alan R. Palmiter, Margaret V. Sachs, Faith Stevelman, and Lynn A. Stout, in support of affirmance.*

AKSHAT TEWARY, Edison, N.J., *for Amicus Curiae Occupy Wall Street - Alternative Banking Group, in support of affirmance.*

TERESA MARIE GOODY, Kalorama Legal Services, PLLC, Washington, D.C., *for Amicus Curiae Harvey L. Pitt, in support of affirmance.*

LORI ALVINO MCGILL, Latham & Watkins LLP, (Robin S. Conrad, Rachel Brand, National Chamber Litigation Center, Inc.; James M. Spears, Melissa B. Kimmel, Pharmaceutical Research and Manufacturers of America, *on the brief*), Washington, D.C., *for Amici Curiae Chamber of Commerce of the United States and*

3

*Pharmaceutical Research and Manufacturers of America*, in support of reversal.

ANNETTE L. NAZARETH, Davis Polk & Wardwell LLP (Edmund Polubinski III, Gina Caruso, *on the brief*) New York, N.Y., *for Amicus Curiae Securities Industry and Financial Markets Association, in support of reversal.*

DANIEL P. CHIPLOCK, Lieff Cabraser Heimann & Bernstein, LLP, New York, N.Y., *for Amicus Curiae National Association of Shareholder and Consumer Attorneys, in support of reversal.*

POOLER, *Circuit Judge*:

The United States Securities and Exchange Commission ("S.E.C.") in conjunction with Citigroup Global Markets, Inc. ("Citigroup") appeals from the November 28, 2011 order of the United States District Court for the Southern District of New York (Rakoff, *J.*) refusing to approve a consent decree entered into by the parties and instead setting a trial date. Our Court stayed that order and referred the matter to a merits panel for consideration of the underlying questions. *S.E.C. v. Citigroup Global Markets, Inc.*, 673 F.3d 158 (2d Cir. 2012). We now hold that the district court abused its discretion by applying an incorrect legal standard in assessing the consent decree and setting a date for trial.

4

**BACKGROUND**

**I.    Complaint and proposed consent judgment.**

In October 2011, the S.E.C. filed a complaint against Citigroup, alleging that Citigroup negligently misrepresented its role and economic interest in structuring and marketing a billion-dollar fund, known as the Class V Funding III ("the Fund"), and violated Sections 17(a)(2) and (3) of the Securities Act of 1933 ( the "Act").  The complaint alleges that Citigroup "exercised significant influence" over the selection of $500 million worth of the Fund's assets, which were primarily collateralized by subprime securities tied to the already faltering U.S. housing market.  Citigroup told Fund investors that the Fund's investment portfolio was chosen by an independent investment advisor, but, the S.E.C. alleged, Citigroup itself selected a substantial amount of negatively projected mortgage-backed assets in which Citigroup had taken a short position.  By assuming a short position, Citigroup realized profits of roughly $160 million from the poor performance of its chosen assets, while Fund investors suffered millions of dollars in losses.

Shortly after filing of the complaint,  the S.E.C. filed a  proposed consent judgment.  In the proposed consent judgment, Citigroup agreed to: (1) a

permanent injunction barring Citigroup from violating Act Sections 17(a)(2) and (3); (2) disgorgement of $160 million, which the S.E.C. asserted were Citigroup's net profits gained as a result of the conduct alleged in the complaint; (3) prejudgment interest in the amount of $30 million; and (4) a civil penalty of $95 million. Citigroup also agreed not to seek an offset against any compensatory damages awarded in any related investor action. Citigroup consented to make internal changes, for a period of three years, to prevent similar acts from happening in the future. Absent from the consent decree was any admission of guilt or liability.

The S.E.C. also filed a parallel complaint against Citigroup employee Brian Stoker. *See S.E.C. v. Brian H. Stoker*, 11 Civ. 7388 (JSR). The *Stoker* complaint alleged that Stoker negligently violated Sections 17(a)(2) and (3) of the Act in connection with his role in structuring and marketing the collateralized debt obligations in the Fund.

**II.     Proceedings before the district court**.

The district court scheduled a hearing in the matter, and presented the S.E.C. and Citigroup with a list of questions to answer. The questions included:

- Why should the Court impose a judgment in a case in which the

S.E.C. alleges a serious securities fraud but the defendant neither admits nor denies wrongdoing?

- Given the S.E.C.'s statutory mandate to ensure transparency in the financial marketplace, is there an overriding public interest in determining whether the S.E.C.'s charges are true? Is the interest even stronger when there is no parallel criminal case?

- How was the amount of the proposed judgment determined? In particular, what calculations went into the determination of the $95 million penalty? Why, for example, is the penalty in this case less than one-fifth of the $535 million penalty assessed in *S.E.C. v. Goldman Sachs & Co.* . . . ? What reason is there to believe this proposed penalty will have a meaningful deterrent effect?

- The proposed judgment imposes injunctive relief against future violations. What does the S.E.C. do to maintain compliance? How many contempt proceedings against large financial entities has the S.E.C. brought in the past decade as a result of violations of prior consent judgments?

- Why is the penalty in this case to be paid in large part by Citigroup and its shareholders rather than by the "culpable individual

7

offenders acting for the corporation?" [] If the S.E.C. was for the most part unable to identify such alleged offenders, why was this?

• How can a securities fraud of this nature and magnitude be the result simply of negligence?

Both the S.E.C. and Citigroup submitted written responses to the district court's questions. On November 9, 2011, the district court conducted a hearing to explore the questions presented. A few weeks later, the district court issued a written opinion declining to approve the consent judgment. *S.E.C. v. Citigroup Global Markets Inc.*, 827 F. Supp. 2d 328 (S.D.N.Y. 2011) ("*Citigroup I*"). The district court stated that

> before a court may employ its injunctive and contempt powers in support of an administrative settlement, it is required, even after giving substantial deference to the views of the administrative agency, to be satisfied that it is not being used as a tool to enforce an agreement that is unfair, unreasonable, inadequate, or in contravention of the public interest.

*Id.* at 332. It found that the proposed consent decree

> is neither fair, nor reasonable, nor adequate, nor in the public interest . . . because it does not provide the Court with a sufficient evidentiary basis to know whether the requested relief is justified under any of these standards. Purely private parties can settle a case

8

without ever agreeing on the facts, for all that is required is that a plaintiff dismiss his complaint. But when a public agency asks a court to become its partner in enforcement by imposing wide-ranging injunctive remedies on a defendant, enforced by the formidable judicial power of contempt, the court, and the public, need some knowledge of what the underlying facts are: for otherwise, the court becomes a mere handmaiden to a settlement privately negotiated on the basis of unknown facts, while the public is deprived of ever knowing the truth in a matter of obvious public importance.

*Id.* (footnotes omitted).

The district court criticized the relief obtained by the S.E.C. in the consent decree, comparing it unfavorably with settlements entered in *S.E.C. v. Bank of America Corp.*, No. 09 Civ. 6829(JSR), 2010 WL 624581 (S.D.N.Y. Feb. 22, 2010), and in *S.E.C. v. Goldman Sachs & Co. et al.*, No. 10 Civ. 3229 (BSJ), Docket No. 25 (S.D.N.Y. July 20, 2010). *See Citigroup I*, 827 F. Supp. 2d at 330-31, 334 n.7. In both *Bank of America* and *Goldman Sachs*, the district court noted, the parties stipulated to certain findings of facts. Without such an evidentiary basis in this case, the district court reasoned, "the Court is forced to conclude that a proposed Consent Judgment that asks the Court to impose substantial injunctive relief, enforced by the Court's own contempt power, on the basis of allegations unsupported by any

proven or acknowledged facts whatsoever, is neither reasonable, nor fair, nor adequate, nor in the public interest." *Id.* at 335.

Thus, the district court concluded:

> An application of judicial power that does not rest on facts is worse than mindless, it is inherently dangerous. The injunctive power of the judiciary is not a free-roving remedy to be invoked at the whim of a regulatory agency, even with the consent of the regulated. If its deployment does not rest on facts—cold, hard, solid facts, established either by admissions or by trials—it serves no lawful or moral purpose and is simply an engine of oppression.

*Id.*

The district court refused to approve the consent judgment, and instead consolidated this case with the *Stoker* action and ordered the parties to be prepared to try both cases on July 16, 2012.

**III.     Prior proceedings before this Court.**

The S.E.C. and Citigroup filed immediate notices of appeal.  The S.E.C. also moved in the district court for an emergency stay pending the outcome of the appeal, but before the district court could decide the stay motion before it, the S.E.C. sought  an emergency stay in our Court.  As an alternative basis for relief, the S.E.C. also filed a petition for a writ of mandamus to set the order aside.

Prior to our Court's ruling on the stay motion and mandamus petition, the district court issued its decision denying the motion for a stay. *S.E.C. v. Citigroup Global Markets Inc.*, 827 F. Supp. 2d 336 (S.D.N.Y. 2011) ("*Citigroup II*"). The district court reasoned that our Court lacked jurisdiction to hear an interlocutory appeal from the denial of approval of a consent judgment. *Id.* at 338-39. As to the S.E.C.'s proposal to file a writ of mandamus as an alternative to a statutory appeal, the district court similarly found that such action would not divest it of jurisdiction, and, consequently, declined to consider the S.E.C.'s request for a stay. *Id.* at 339-40.

Our Court disagreed, granting the motion for a stay pending before us. *S.E.C. v. Citigroup Global Markets Inc.*, 673 F.3d 158 (2d Cir. 2012) ("*Citigroup III*"). We concluded that the S.E.C. demonstrated a strong likelihood of success on the merits, because the district court did not accord the S.E.C.'s judgment adequate deference. *Id.* at 163-65. As both parties before us advocated for approving the consent order, we ordered counsel appointed to advocate for the district court's order. *Id.* at 169. Before us now is the merits appeal.

**ANALYSIS**

We review the district court's denial of a settlement agreement under an abuse of discretion standard.  *See S.E.C. v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991).  A district court abuses its discretion if it "(1) based its ruling on an erroneous view of the law," (2) made a "clearly erroneous assessment of the evidence," or (3) "rendered a decision that cannot be located within the range of permissible decisions." *Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir. 2009) (internal quotation marks omitted).

**I.      Appellate jurisdiction.**

The S.E.C. argues that we have jurisdiction to consider this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1).  We agree.  Section 1292(a)(1) states in relevant part:

> (a) [T]he courts of appeals shall have jurisdiction of
> appeals from:
> (1) Interlocutory orders of the district courts of the
> United States, . . . or of the judges thereof, granting,
> continuing, modifying, refusing or dissolving
> injunctions, or refusing to dissolve or modify
> injunctions. . . .

"Because § 1292(a)(1) was intended to carve out only a limited exception to the final-judgment rule, we have construed the statute narrowly to ensure that

12

appeal as of right under § 1292(a)(1) will be available only in circumstances where an appeal will further the statutory purpose of permitting litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence." *Carson v. Am. Brands Inc.*, 450 U.S. 79, 84 (1981) (internal quotation marks omitted).  Thus, "[u]nless a litigant can show that an interlocutory order of the district court might have a serious, perhaps irreparable, consequence, and that the order can be effectually challenged only by immediate appeal, the general congressional policy against piecemeal review will preclude interlocutory appeal."  *Id.* (internal quotation marks omitted).

In *Carson,* the consent decree at issue permanently enjoined an employer and a union from discriminating against African-American employees, required changes to the way seniority and benefits were awarded, established hiring goals, and granted job bidding preferences.  450 U.S. at 84.  The *Carson* court found the district court's refusal to approve the consent decree constituted irreparable harm because:

> the District Court made clear that it would not enter any decree containing remedial relief provisions that did not rest solidly on evidence of discrimination and that were not expressly limited to actual victims of discrimination. In ruling so broadly, the court did more than postpone

consideration of the merits of petitioners' injunctive claim. It effectively foreclosed such consideration. Having stated that it could perceive no vestiges of racial discrimination on the facts presented, and that even if it could, no relief could be granted to future employees and others who were not actual victims of discrimination, the court made clear that nothing short of an admission of discrimination by respondents plus a complete restructuring of the class relief would induce it to approve remedial injunctive provisions.

*Id.* at 87 n.12 (internal quotation marks omitted). Moreover, the *Carson* court found that "[b]ecause a party to a pending settlement might be legally justified in withdrawing its consent to the agreement once trial is held and final judgment entered, the District Court's order might thus have the 'serious, perhaps irreparable, consequence' of denying the parties their right to compromise their dispute on mutually agreeable terms." *Id.* at 87–88 (footnote omitted). Finally, by delaying approval of the consent decree, the plaintiffs were losing access to the "specific job opportunities and the training and competitive advantages that would come with those opportunities." *Id.* at 89 n.16.

In *New York v. Dairylea Cooperative, Inc.*, the parties entered into a settlement to resolve a civil antitrust action. 698 F.2d 567, 568-69 (2d Cir. 1983). The settlement included a provision labeled "Injunction" that:

14

would enjoin Dairylea from participating in any agreement to fix the price of milk or allocate customers during the next six years. . . . Dairylea [also] agreed to allow New York access to its books, records and personnel and to publicize, among its employees, the terms of the arrangement for the purpose of ensuring Dairylea's compliance with the decree's provisions.

*Id.* at 569.  We found that the proposed injunction did not meet the requirements of *Carson* because the settlement agreement proposed minimal injunctive relief: defendants were enjoined from violating the law.  *Id.* at 570.  The parties argued that "because the proposed settlement would enjoin Dairylea from participating in any conspiracy to fix prices or allocate customers," the "order disapproving the settlement is in effect the denial of an injunction." *Id.*  We disagreed:

Taken to its extreme [] this argument would render the disapproval of every proposed settlement appealable. It would be a simple matter for the settling parties to include in the agreement an injunctive provision forbidding one party from violating the law. The mere existence of an injunctive clause, therefore, cannot be sufficient to render the disapproval of a proposed settlement agreement appealable.

*Id.*

Thus, to bring an interlocutory appeal from a district court's denial of settlement approval, a party must demonstrate "that (1) the district court, by

refusing to approve a settlement, effectively denied a party injunctive relief and (2) in the absence of an interlocutory appeal, a party will suffer irreparable harm." *Grant v. Local 638*, 373 F.3d 104, 108 (2d Cir. 2004). That standard is satisfied here. The rejected consent decree provided for two types of injunctive relief: (1) enjoining Citigroup from violating provisions of the Act in the future, and (2) requiring Citigroup to undertake steps aimed at preventing future occurrences of securities fraud, and periodically demonstrate compliance to the S.E.C.. The S.E.C. also demonstrated irreparable harm: unlike the court in *Dairylea*, here the district court expressed no willingness to revisit the settlement agreement with the parties, instead setting a trial date. *See, e.g., Grant*, 373 F.3d at 111 ("It bears repeating that the *Carson* court relied heavily on the district court's warning that it would never approve a settlement similar to the one the parties made." (citing *Carson*, 450 U.S. at 87 n.12)). We are satisfied that our Court may exercise jurisdiction over this interlocutory appeal.

**II.     The scope of the consent decree.**

We quickly dispense with the argument that the district court abused its discretion by requiring Citigroup to admit liability as a condition for approving the consent decree. In both the briefing and at oral argument, the district court's

16

*pro bono* counsel stated that the district court did not seek an admission of liability before approving the consent decree. With good reason–there is no basis in the law for the district court to require an admission of liability as a condition for approving a settlement between the parties. The decision to require an admission of liability before entering into a consent decree rests squarely with the S.E.C.. As the district court did not condition its approval of the consent decree on an admission of liability, we need not address the issue further.

**III.    The scope of deference.**

We turn, then, to the far thornier question of what deference the district court owes an agency seeking a consent decree. Our Court recognizes a "strong federal policy favoring the approval and enforcement of consent decrees." *Wang*, 944 F.2d at 85. "To be sure, when the district judge is presented with a proposed consent judgment, he is not merely a 'rubber stamp.'" *S.E.C. v. Levine*, 881 F.2d 1165, 1181 (2d Cir. 1989). The district court here found it was "required, even after giving substantial deference to the views of the administrative agency, to be satisfied that it is not being used as a tool to enforce an agreement that is unfair, unreasonable, inadequate, or in contravention of the public interest." *Citigroup I*, 827 F. Supp. 2d at 332. Other district courts in our Circuit view "[t]he

role of the Court in reviewing and approving proposed consent judgments in S.E.C. enforcement actions [as] 'restricted to assessing whether the settlement is fair, reasonable and adequate within the limitations Congress has imposed on the S.E.C. to recover investor losses.'" *S.E.C. v. CR Intrinsic Investors, LLC*, 939 F. Supp. 2d 431, 434 (S.D.N.Y. 2013) (quoting *S.E.C. v. Cioffi*, 868 F. Supp. 2d 65, 74 (E.D.N.Y. 2012)); *see also United States v. Peterson*, 859 F. Supp. 2d 477, 478 (E.D.N.Y. 2012) ("A  district court has the duty to determine whether a consent decree based on a proposed settlement is 'fair and reasonable.'").

The "fair, reasonable, adequate and in the public interest" standard invoked by the district court finds its origins in a variety of cases.  Our Court previously held, in the context of assessing a plan for distributing the proceeds of a proposed disgorgement order, that "once the district court satisfies itself that the distribution of proceeds in a proposed S.E.C. disgorgement plan is fair and reasonable, its review is at an end."  *Wang*, 944 F.2d at 85.  The Ninth Circuit— in circumstances similar to those presented here, a proposed consent decree aimed at settling an S.E.C. enforcement action—noted that "[u]nless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved."  *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984).

Today we clarify that the proper standard for reviewing a proposed consent judgment involving an enforcement agency requires that the district court determine whether the proposed consent decree is fair and reasonable, with the additional requirement that the "public interest would not be disserved," *eBay, Inc. v. MercExchange*, 547 U.S. 388, 391 (2006), in the event that the consent decree includes injunctive relief.  Absent a substantial basis in the record for concluding that the proposed consent decree does not meet these requirements, the district court is required to enter the order.

We omit "adequacy" from the standard.  Scrutinizing a proposed  consent decree for "adequacy" appears borrowed from the review applied to class action settlements, and strikes us as particularly inapt in the context of a proposed S.E.C. consent decree.  *See* Fed. R. Civ. P. 23(e)(2) ("If the proposal would bind the class members, the court may approve it only after a hearing and on a finding that it is fair, reasonable, and adequate.").  The adequacy requirement makes perfect sense in the context of a class action settlement—a class action settlement typically precludes future claims, and a court is rightly concerned that the settlement achieved be adequate.  By the same token, a consent decree does not pose the same concerns regarding adequacy—if there are potential plaintiffs with

19

a private right of action, those plaintiffs are free to bring their own actions. If there is no private right of action, then the S.E.C. is the entity charged with representing the victims, and is politically liable if it fails to adequately perform its duties.

A court evaluating a proposed S.E.C. consent decree for fairness and reasonableness should, at a minimum, assess (1) the basic legality of the decree, *see Benjamin v. Jacobson*, 172 F.3d 144, 155-59 (2d Cir. 1999) (terminating existing consent decrees as required by the Prison Litigation Reform Act); (2) whether the terms of the decree, including its enforcement mechanism, are clear, *see, e.g.*, *Angela R. ex rel. Hesselbein v. Clinton*, 999 F.2d 320, 325 (8th Cir. 1993) (district court abused its discretion by approving consent decree that did not properly define the enforcement mechanisms); (3) whether the consent decree reflects a resolution of the actual claims in the complaint; and (4) whether the consent decree is tainted by improper collusion or corruption of some kind. *Cf. Kozlowski v. Coughlin*, 871 F.2d 241, 244 (2d Cir. 1989) ("Before entering a consent judgment, the district court must be certain that the decree 1) springs from and serves to resolve a dispute within the court's subject-matter jurisdiction, 2) comes within the general scope of the case made by the pleadings, and 3) furthers the objectives

20

of the law upon which the complaint was based." (internal quotation marks and alternations omitted)). Consent decrees vary, and depending on the decree a district court may need to make additional inquiry to ensure that the consent decree is fair and reasonable. The primary focus of the inquiry, however, should be on ensuring the consent decree is procedurally proper, using objective measures similar to the factors set out above, taking care not to infringe on the S.E.C.'s discretionary authority to settle on a particular set of terms.

It is an abuse of discretion to require, as the district court did here, that the S.E.C. establish the "truth" of the allegations against a settling party as a condition for approving the consent decrees. *Citigroup I*, 827 F. Supp. 2d at 332-33. Trials are primarily about the truth. Consent decrees are primarily about pragmatism. "[C]onsent decrees are normally compromises in which the parties give up something they might have won in litigation and waive their rights to litigation." *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 235 (1975). Thus, a consent decree "must be construed as . . . written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." *United States v. Armour & Co.*, 402 U.S. 673, 682 (2d Cir. 1971). Consent decrees provide parties with a means to manage risk. "The

21

numerous factors that affect a litigant's decision whether to compromise a case or litigate it to the end include the value of the particular proposed compromise, the perceived likelihood of obtaining a still better settlement, the prospects of coming out better, or worse, after a full trial, and the resources that would need to be expended in the attempt." *Citigroup III*, 673 F.3d at 164; *see also Randolph*, 736 F.2d at 529 ("Compromise is the essence of settlement. Even if the Commission's case against [defendants] is strong, proceeding to trial would still be costly. The S.E.C.'s resources are limited, and that is why it often uses consent decrees as a means of enforcement." (citation omitted)). These assessments are uniquely for the litigants to make. It is not within the district court's purview to demand "cold, hard, solid facts, established either by admissions or by trials," *Citigroup I*, 827 F. Supp. 2d at 335, as to the truth of the allegations in the complaint as a condition for approving a consent decree.

As part of its review, the district court will necessarily establish that a factual basis exists for the proposed decree. In many cases, setting out the colorable claims, supported by factual averments by the S.E.C., neither admitted nor denied by the wrongdoer, will suffice to allow the district court to conduct its review. Other cases may require more of a showing, for example, if the district

22

court's initial review of the record raises a suspicion that the consent decree was entered into as a result of improper collusion between the S.E.C. and the settling party. We need not, and do not, delineate the precise contours of the factual basis required to obtain approval for each consent decree that may pass before the court. It is enough to state that the district court here, with the benefit of copious submissions by the parties, likely had a sufficient record before it on which to determine if the proposed decree was fair and reasonable. On remand, if the district court finds it necessary, it may ask the S.E.C. and Citigroup to provide additional information sufficient to allay any concerns the district court may have regarding improper collusion between the parties.

As noted earlier, when a proposed consent decree contains injunctive relief, a district court must also consider the public interest in deciding whether to grant the injunction. *See eBay*, 547 U.S. at 391; *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010). *eBay* makes clear that

> a plaintiff seeking a permanent injunction must satisfy a
> four-factor test before a court may grant such relief. A
> plaintiff must demonstrate: (1) that it has suffered an
> irreparable injury; (2) that remedies available at law,
> such as monetary damages, are inadequate to
> compensate for that injury; (3) that, considering the
> balance of hardships between the plaintiff and

23

defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

547 U.S. at 391. "*eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context," be they preliminary or permanent. *Salinger*, 607 F.3d at 78; *see also World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 160-61 (2d Cir. 2012) (applying the *eBay* test to a permanent injunction sought to remedy a breach of an exclusive distributorship agreement).

Our analysis focuses on the issue reached by the district court: that the district court must assure itself the "public interest would not be disserved" by the issuance of a permanent injunction. *eBay*, 547 U.S. at 391; *cf. WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 278 (2d Cir. 2012) (describing the test as "non-disservice of the public interest by issuance of a preliminary injunction.")[1]

The job of determining whether the proposed S.E.C. consent decree best serves the public interest, however, rests squarely with the S.E.C., and its

---

[1] The district court did not address, and the parties do not brief, whether the remaining *eBay* factors were satisfied here. We therefore do not address this issue, except to note that the proposed consent decree waived Citigroup's right to challenge any enforcement action on the ground that the consent decree fails to conform to the requirements of Rule 65 of the Federal Rules of Civil Procedure.

24

decision merits significant deference:

> [F]ederal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the public branches."

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 866 (1984)

(quoting *TVA v. Hill*, 437 U.S. 153, 195 (1978)); *see also In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 118 (2d Cir. 1992) ("Appellate courts ordinarily defer to the agency's expertise and the voluntary agreement of the parties in proposing the settlement.").

The district court correctly recognized that it was required to consider the public interest in deciding whether to grant the injunctive relief in the proposed injunction. *Citigroup I*, 827 F. Supp. 2d at 331. However, the district court made no findings that the injunctive relief proposed in the consent decree would disserve the public interest, in part because it defined the public interest as "an overriding interest in knowing the truth." *Id.* at 335. The district court's failure to make the proper inquiry constitutes legal error. On remand, the district court should consider whether the public interest would be disserved by entry of the

25

consent decree. For example, a consent decree may disserve the public interest if it barred private litigants from pursuing their own claims independent of the relief obtained under the consent decree. What the district court may not do is find the public interest disserved based on its disagreement with the S.E.C.'s decisions on discretionary matters of policy, such as deciding to settle without requiring an admission of liability.

To the extent the district court withheld approval of the consent decree on the ground that it believed the S.E.C. failed to bring the proper charges against Citigroup, that constituted an abuse of discretion. *See Citigroup I*, 827 F. Supp. 2d at 330. In comparing the complaint filed by the S.E.C. against Citigroup with the complaint filed by the S.E.C. against Stoker, the district court noted that "[a]lthough this would appear to be tantamount to an allegation of knowing and fraudulent intent ('*scienter*,' in the lingo of securities law), the S.E.C., for reasons of its own, chose to charge Citigroup only with negligence, in violation of Sections 17(a)(2) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(2) and (3)." *Id*. The exclusive right to choose which charges to levy against a defendant rests with the S.E.C. *See, e.g., United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995) ("[T]he district court is not empowered to review the actions or

behavior of the Department of Justice; the court is only authorized to review the decree itself."); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."). Nor can the district court reject a consent decree on the ground that it fails to provide collateral estoppel assistance to private litigants—that simply is not the job of the courts.

Finally, we note that to the extent that the S.E.C. does not wish to engage with the courts, it is free to eschew the involvement of the courts and employ its own arsenal of remedies instead. *See, e.g.*, Exchange Act § 21C(a), 15 U.S.C. § 78u-3(a); Securities Act § 8A(a), 15 U.S.C. § 77h-1(a). The S.E.C. can also order the disgorgement of profits. Exchange Act § 21B(e), 15 U.S.C. § 78u-2(e); Securities Act § 8A(e), 15 U.S.C. § 77h-1(e). Admittedly, these remedies may not be on par with the relief afforded by a so-ordered consent decree and federal court injunctions. But if the S.E.C. prefers to call upon the power of the courts in ordering a consent decree and issuing an injunction, then the S.E.C. must be willing to assure the court that the settlement proposed is fair and reasonable. "Consent decrees are a hybrid in the sense that they are at once both contracts

27

and orders; they are construed largely as contracts, but are enforced as orders."

*Berger v. Heckler*, 771 F.2d 1556, 1568-69 (2d Cir. 1985) (citation omitted).  For the courts to simply accept a proposed S.E.C. consent decree without any review would be a dereliction of the court's duty to ensure the orders it enters are proper.

**CONCLUSION**

For the reasons given above, we vacate the November 28, 2011 order of the district court and remand this case for further proceedings in accordance with this opinion.   As we exercise jurisdiction pursuant to Section 1292(a)(1), the petition for a writ of mandamus is denied as moot.

28

LOHIER, <u>Circuit Judge</u>, <u>concurring</u>:

I thank my panel colleagues for addressing many of my concerns in this case. In particular, today's majority opinion makes clear that district courts assessing a proposed consent decree should consider principally four factors: "(1) the basic legality of the decree; (2) whether the terms of the decree, including its enforcement mechanism, are clear; (3) whether the consent decree reflects a resolution of the actual claims in the complaint; and (4) whether the consent decree is tainted by improper collusion or corruption of some kind." Majority Op., <u>ante</u>, at 20-21 (citations omitted). I write separately to make two more observations.

First, in my view, the "fair and reasonable" standard for assessing the appropriateness of monetary relief (as opposed to injunctive relief) involves a straightforward analysis of <u>only</u> the four factors identified by the majority and described above. If all four factors are satisfied, the perceived modesty of monetary penalties proposed in a consent decree is not a reason to reject the decree.

Second, I would be inclined to reverse on the factual record before us and direct the District Court to enter the consent decree. It does not appear that any additional facts are needed to determine that the proposed decree is "fair and reasonable" and does not disserve the public interest. Nor, to use

the words of the majority opinion's holding, is there a "substantial basis . . . for concluding" that further development of the record will show that the proposed terms of this decree are not fair, reasonable, and in the public interest. Under the circumstances, though, it does no harm to vacate and remand to permit the very able and distinguished District Judge to make that determination in the first instance.