25-44-cv
*United States Equal Employment Opportunity Commission v. Local 580*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## <u>SUMMARY ORDER</u>

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.  CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER").  A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 12th day of February, two thousand twenty-six.

PRESENT:
> GUIDO CALABRESI,
> EUNICE C. LEE,
> ALISON J. NATHAN,
> *Circuit Judges.*

_____

**United States Equal Employment Opportunity Commission,**

> *Plaintiff-Appellant,*

> **v.**

No. 25-44-cv

**Local 580 of the International Association of Bridge, Structural and Ornamental Ironworkers, Joint Apprentice-Journeymen Educational Fund of the Architectural Ornamental Iron Workers**

**Local 580, Allied Building Metal Industries,**

*Defendants.* *

_____

**FOR PLAINTIFF-APPELLANT:**

DARA S. SMITH, Jennifer S. Goldstein, *Associate General Counsel*, Andrew B. Rogers, *Acting General Counsel*, Equal Employment Opportunity Commission, Washington, D.C.

Appeal from an order of the United States District Court for the Southern District of New York (Kaplan, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment is **AFFIRMED**.

The United States Equal Employment Opportunity Commission (the EEOC) appeals from a November 6, 2024 order denying the parties' joint motion to enter a proposed consent decree. The EEOC argues that the district court abused its discretion by concluding that the proposed settlement was not "fair and reasonable," nor in the service of "the public interest," as required by *S.E.C. v.*

_____

* The Clerk of Court is respectfully directed to amend the caption as set forth above.

*Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 294 (2d Cir. 2014) (quotation marks omitted).

This dispute brings with it over fifty years of history. We assume the parties' familiarity with the bulk of that background, highlighting it only as necessary to explain our decision to affirm the district court's order.

## I. Factual Background

In 1971, the Department of Justice sued Local 580 of the International Association of Bridge, Structural and Ornamental Ironworkers and the Joint Apprentice-Journeymen Educational Fund of the Architectural Ornamental Iron Workers Local 580 (together, Local 580) for racial discrimination in their employment practices in violation of Title VII of the Civil Rights Act of 1964.[1] The complaint alleged that Local 580 engaged in "patterns and practices" with the effect of "denying employment opportunities to non-whites on account of their race" by, *inter alia*, systemically excluding them from union membership and refusing to refer them to available ironworking jobs. App'x at 150.

---

[1] The original complaint also named Allied Building Metal Industries as a defendant for purposes of relief only, as well as several other union defendants for their alleged Title VII violations. None of the other union defendants are involved in this appeal. The EEOC was substituted for the Department of Justice as plaintiff in 1974.

Local 580 and the EEOC later negotiated a proposed consent decree, which the district court entered in 1978. The 1978 consent judgment imposed a wide range of obligations on the union, with the purposes of both remediating past discrimination and ensuring equitable treatment of all members moving forward. In relevant part, it permanently enjoined Local 580 from discriminating against Black and Hispanic ironworkers, created a remedial plan with benchmarks for Black and Hispanic membership, and required the union to collect certain data regarding the operation of its "referral hall"—a clearinghouse in which the union matches available members with employers requesting ironworking services. *See* App'x at 185.

Local 580 largely failed to comply with those obligations. Throughout the 1980s and 1990s, the district court found Local 580 in contempt on several occasions.[2] As a result of those contempt orders, the district court increased the

---

[2] *See E.E.O.C. v. Loc. 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers*, 669 F. Supp. 606 (S.D.N.Y. 1987); *E.E.O.C. v. Loc. 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers*, No. 71-cv-2877, 1988 WL 131293 (S.D.N.Y. Dec. 1, 1988), *aff'd sub nom.*, *E.E.O.C. v. Loc. 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund*, 925 F.2d 588 (2d Cir. 1991); *E.E.O.C. v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers Loc. 580*, No. 71-cv-2877, 2011 WL 1219261 (S.D.N.Y. Mar. 11, 2011), *report and recommendation adopted*, No. 71-cv-2877, 2011 WL 1236592 (S.D.N.Y. Mar. 29, 2011).

union's remedial obligations in several ways: It reshaped the union's referral hall practices, commenced backpay hearings to provide compensation for harmed Local 580 members, and appointed Special Master David Raff to oversee the union's future compliance with court orders. In 2011, the district court issued its most recent contempt order against the union for its failure to comply with the court-ordered referral hall system. *See E.E.O.C. v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers Loc. 580*, No. 71-cv-2877, 2011 WL 1219261 (S.D.N.Y. Mar. 11, 2011), *report and recommendation adopted*, No. 71-cv-2877, 2011 WL 1236592 (S.D.N.Y. Mar. 29, 2011).

In 2019, after several years without receiving complaints of discrimination from Local 580 members, the EEOC began to evaluate whether continued supervision of the union was warranted. The agency gathered both anecdotal and statistical evidence.

As to anecdotal evidence, the agency interviewed 41 current and former Black and Hispanic members of Local 580. Of that group, seven members—or 17% of those interviewed—reported experiencing racial discrimination related to the union. Most of the reported discrimination involved the operation of the union's

referral hall or the allocation of desirable long-term jobs versus short-term roles offering fewer hours.

As to statistical evidence, the EEOC's labor economist, Dr. Erich Cromwell, prepared a report based on two datasets provided to him by Local 580. The first dataset—the "fund office data"—tracked each union member's hours worked and length of job tenure between 2009–2019. *See* App'x at 386–403. Dr. Cromwell's analysis of the fund office data revealed significant racial disparities with respect to hours worked and length of job tenure—that is to say, white union members on average received more overtime hours and more working days per year than similarly-situated Black and Hispanic members. But Dr. Cromwell determined that those disparities likely arose from the actions of employers, not those of Local 580. Next, Dr. Cromwell analyzed the union's "hiring hall dispatch data," which included information on how often each union member was dispatched to a job through the union's referral hall. *See id.* at 420. Dr. Cromwell acknowledged that the hiring hall dataset was "limit[ed]," *id.* at 404, because Local 580 had properly collected the data from only June 2018 onwards, limiting Dr. Cromwell's analysis to approximately a year (June 2018–2019). But based on his analysis of that

6

truncated dataset, Dr. Cromwell did not find statistically significant racial disparities in the operation of the union's referral hall.[3]

Based on the above evidence, the EEOC entered negotiations with Local 580 with the aim of bringing court supervision in this case to an end. Those discussions culminated in a proposed consent decree that would impose new obligations on the union (such as appointing a Compliance Officer and creating an anti-discrimination policy) but also, importantly, would vacate all previous remedial obligations, terminate Special Master Raff immediately, and sunset court supervision of Local 580 entirely after three years.

## II.    Procedural History

In 2020, the parties moved jointly in the district court to enter that proposed consent decree. Before resolving the motion, the district court ordered the parties to produce more information. As relevant here, it asked for (1) the union's referral hall data between 2009–2018, which was missing from Dr. Cromwell's report but

---

[3] Dr. Cromwell also used the fund office data to examine the average stint of unemployment for union members. There, he found mixed results: One regression showed that Hispanic workers experienced shorter unemployment length than white workers, several showed that the unemployment lengths for all workers were relatively equal, and another showed that Black workers experienced longer unemployment times than white workers.

which the union was mandated by court order to collect, and (2) evidence of the union's efforts to ameliorate the working hours and job tenure disparities documented in Dr. Cromwell's report. The EEOC submitted supplemental information, but the district court found it unsatisfactory, noting that the agency had "entirely failed" to produce the missing referral hall data and had not "set out the actions Local 580 has taken to address the fact that white members work more hours than Black and Hispanic members." *E.E.O.C. v. Int'l Ass'n of Bridge, Structural, & Ornamental Ironworkers Loc. 580*, No. 71-cv-2877, 2022 WL 1182069, at *1 (S.D.N.Y. Mar. 30, 2022). The district court thus denied the parties' joint motion without prejudice, inviting them to return once they could provide the required information. *Id.* at *2.

One year later, the parties renewed their joint motion to enter the same proposed consent decree. The district court denied that motion in 2024, reasoning that the proposed settlement was not "fair and reasonable," nor in the public's interest. *See Citigroup*, 752 F.3d at 294. As to the "fair and reasonable" analysis, without the 2009–2018 referral hall data, the district court found that it could not rely on Dr. Cromwell's conclusion that the Local 580 referral hall no longer operated in a discriminatory manner. *E.E.O.C. v. Int'l Ass'n of Bridge, Structural &*

*Ornamental Ironworkers Loc. 580*, No. 71-cv-2877, 2024 WL 4700014, at *4–5 (S.D.N.Y. Nov. 6, 2024). The union's failure to collect that data, coupled with the lack of evidence that Local 580 had attempted to ameliorate the racial disparities in hours worked and job tenure, led the district court to conclude that lifting the obligations on the union at this point would not resolve the original allegations brought in the 1971 complaint. *Id.* at *6–8. Finally, as to the public interest, the district court concluded that entering the proposed consent decree would signal to future defendants that they may disregard court orders (here, mandatory recordkeeping) without consequence, and it separately determined that the EEOC's current assessment of the public interest lacked reliability given the agency's shifting priorities throughout the litigation. *Id.* at *8–9.

The EEOC timely appealed. It argues that the district court abused its discretion by concluding that the proposed consent decree was not fair and reasonable nor in the public's interest. We disagree and affirm the district court's order.

### III.    Discussion

As a preliminary matter, we assume our appellate jurisdiction for the purposes of this appeal. Although a district court's decision to decline entry of a

proposed consent decree is not categorically appealable, 28 U.S.C. § 1291 is a statutory jurisdictional constraint, not a constitutional one. "[W]here a question of statutory (non-Article III) jurisdiction is complex and the claim fails on other more obvious grounds, this Court can assume hypothetical jurisdiction in order to dismiss on those obvious grounds." *Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 123 (2d Cir. 2020).

We review the district court's denial of a proposed consent decree for abuse of discretion. *See Citigroup*, 752 F.3d at 291. As the district court here correctly recognized, *Citigroup* sets "the proper standard for reviewing a proposed consent judgment involving an enforcement agency[.]" *Id.* at 294. The EEOC, however, devotes the bulk of its briefing to the "changed circumstances" analysis—the appropriate standard when a district court considers a motion made pursuant to Federal Rule of Civil Procedure 60(b)(5). *See Horne v. Flores*, 557 U.S. 433, 447 (2009). But here, neither party moved for relief from the previous consent judgment pursuant to Rule 60(b)(5). Instead, both the 2020 and 2023 motions were "Joint Motion[s] to Approve Consent Decree," App'x at 252, 378, which is unsurprising given that the parties sought to establish *new* legal obligations on the

10

union, not merely to vacate old ones.[4]  Because the parties here, in both style and substance, moved to enter a "proposed consent judgment involving an enforcement agency," the district court used the *Citigroup* factors to analyze that request.  *Citigroup*, 752 F.3d at 294.  Given this procedural posture, we agree that *Citigroup* provides the applicable standard.[5]

Employing that standard here, *Citigroup* "requires that the district court determine whether the proposed consent decree is fair and reasonable, with the additional requirement that the public interest would not be disserved, . . . in the event that the consent decree includes injunctive relief."  *Id.* at 294 (internal quotation marks omitted).  To enter this proposed settlement, then, the district court had to both determine that the agreement was "fair and reasonable," and, separately, that it would not disserve the public interest.  In this case, the district court found that the proposed consent decree between Local 580 and the EEOC ticked neither box.

---

[4] The EEOC acknowledges in its brief that both "[t]he parties and district court treated *Citigroup* as providing the applicable framework for reviewing the terms of the new proposed decree" in the proceedings below.  App. Br. at 40 n.3.

[5] We thus express no view on whether the parties have shown sufficiently "changed circumstances" for the purposes of Rule 60(b)(5).

### a. Fair and Reasonable

Whether a proposed settlement is "fair and reasonable" requires a consideration of four factors: "(1) the basic legality of the decree; (2) whether the terms of the decree, including its enforcement mechanism, are clear; (3) whether the consent decree reflects a resolution of the actual claims in the complaint; and (4) whether the consent decree is tainted by improper collusion or corruption of some kind." *Id.* at 294–95 (citations omitted). Though the district court is "not merely a rubber stamp" in this process, *id.* at 293 (internal quotation marks omitted), we have said that "[a]bsent a substantial basis in the record for concluding that the proposed consent decree does not meet these requirements, the district court is required to enter the order," *id.* at 294. The district court here identified a substantial basis for concluding that the proposed consent decree did not adequately address the third factor in *Citigroup*: the proposal "would fail to resolve the core claims of the complaint[.]" *Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers Loc. 580*, 2024 WL 4700014, at *6.

That conclusion was not an abuse of its discretion. As the district court identified, Local 580 has consistently failed to comply with its court-ordered recordkeeping requirements, including with respect to critical data about the

12

operation of its referral hall. Without adequate data about the union's referral hall, Dr. Cromwell's conclusion—that Local 580 now operates the hall in a race-neutral manner—is of limited utility. Given the lack of reliable data, the district court reasonably concluded that it was unclear if the proposed consent decree would "actually improve racial disparities among union workers—the entire purpose of this litigation." *Id.* at *8.

The EEOC contends that the district court's analysis overstepped the bounds of *Citigroup*, which requires it to "ensur[e] the consent decree is procedurally proper" by considering the four factors listed above, while "taking care not to infringe on the [agency's] discretionary authority to settle on a particular set of terms." *Citigroup*, 752 F.3d at 295. Drawing on that latter directive, the EEOC claims that a district court need only decide whether a proposed consent decree addresses the complaint's allegations in a general, thematic sense—doing anything more, it says, infringes on the EEOC's discretion to settle this dispute. But the agency's argument ignores the sentence that comes immediately beforehand: "Consent decrees vary, and depending on the decree a district court may need to make additional inquiry to ensure that the consent decree is fair and reasonable." *Id.* As we explained in *Citigroup*, sometimes "colorable claims,

13

supported by factual averments by the [agency], . . . will suffice to allow the district court to conduct its review." *Id.* But other circumstances "may require more of a showing" from the parties, and we declined to "delineate the precise contours of the factual basis required to obtain approval for each consent decree that may pass before the court." *Id.* at 295–96. Given the more than fifty-year history of this litigation—including the multiple contempt orders issued against Local 580, some related to its failure to keep mandated records—the district court concluded that a more extensive factual record was required to evaluate whether the proposed settlement addressed the claims in the 1971 complaint. That decision is not an abuse of its discretion, nor does it unduly infringe upon the agency's discretionary authority.

We hold that the district court did not abuse its discretion by concluding that the proposed settlement was not "fair and reasonable."[6]

---

[6] The district court also noted that "[i]t is an open question whether a district court can review a proposed consent decree in the Title VII context for its adequacy." *Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers Loc. 580*, 2024 WL 4700014, at *3. In *Citigroup*, we held that a district court evaluating a proposed settlement between the SEC and a defendant must consider whether that proposal is "fair and reasonable," but must not consider whether it is "adequate." 752 F.3d at 294. However, before *Citigroup*, district courts often evaluated proposed consent decrees in the Title VII context for adequacy. The district court here expressed concern that not evaluating a settlement's adequacy in the Title VII context would conflict with Congress' broad intent in passing that statute.

### b. Public Interest

Because a proposed consent decree that includes injunctive relief must be both "fair and reasonable" and not disserve the public interest, it is enough for us to affirm the district court's conclusion on the first ground. However, because the district court went on to evaluate the public interest factor in its order, we do the same.

In *Citigroup*, we said that an enforcement agency's determination of the public interest "merits significant deference." *Id.* at 296. However, we made clear that the district court must also conduct its own review of the public interest. To serve both ends, we held that the district court cannot reject a proposed settlement based *solely* on "its disagreement with the [agency's] decisions on discretionary matters of policy[.]" *Id.* at 297. At the same time, the court must examine public interest considerations outside of the agency's discretionary policy matters such

---

*See Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers Loc. 580*, 2024 WL 4700014, at *3 n.34 ("Where racial discrimination is concerned, the district court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975))). But after identifying this open question, the district court declined to consider the instant settlement's adequacy; it instead considered only whether it was "fair and reasonable." We thus do not decide whether consent decrees in the Title VII context must also be "adequate."

as, for example, whether the proposed settlement would "bar[] private litigants from pursuing their own claims" against the defendant. *Id.* We struck this balance to promote deference to agency judgments where appropriate while also ensuring that district courts do not become mere rubber stamps for enforcement agencies. *See id.* at 298 ("For the courts to simply accept a proposed [agency] consent decree without any review would be a dereliction of the court's duty to ensure the orders it enters are proper.").

The district court here described two principal reasons underlying its determination that the proposed settlement was not in the public's interest. First, it cited Local 580's persistent failure to comply with its recordkeeping mandates, noting that entering a favorable judgment now could signal to future litigants that disregard for court-ordered obligations will be rewarded. Second, it elected not to defer to the EEOC's analysis of the public interest based in part on the agency's inconsistent policy priorities throughout this litigation.

We conclude that the district court's second reason was likely error under *Citigroup*, but its first was not. As to that first reason, our decision in *Citigroup* expressly instructs district courts to consider public interest factors independent from the agency's policy goals. A district court decision's signaling value to future

16

litigants is certainly a consideration separate from the EEOC's policy judgments and thus appropriately considered under the guise of the public interest inquiry. As to the district court's second reason, because it "may not . . . find the public interest disserved based on its disagreement with the [agency's] decisions on discretionary matters of policy," we find that its failure to defer to the EEOC on core agency policy considerations was likely error. *Id.* at 297. However, this error does not alter our decision. Because a proposed consent decree must be "fair and reasonable," and because the district court reasonably determined that this proposed consent decree was not, we affirm the district court's judgment.

\* \* \*

We have considered the EEOC's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

17